# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JAMODD AMAUL SALLIS,

        Plaintiff,

vs.

JOANNE NATHEM, et al.,

        Defendants.

No.  C23-2003-LTS

**MEMORANDUM
OPINION AND ORDER**

## I.    INTRODUCTION

This matter is before me on a motion (Doc. 55) for summary judgment filed by defendants NaphCare Inc. (NaphCare) and Joanne Nathem[1] (the NaphCare defendants), and a motion (Doc. 57) for summary judgment filed by defendants Black Hawk County Sheriff's Office, Julie Lein,[2] Nathan Neff[3] and Tony Thompson[4] (the Black Hawk County defendants).  Plaintiff Jamodd Amaul Sallis has filed a resistance (Doc. 71) to both motions and defendants have filed replies (Docs. 74, 75).  Oral argument is not necessary.  *See* Local Rule 7(c).

## II.    PROCEDURAL HISTORY

On January 5, 2023, Sallis commenced this action by filing a 42 U.S.C. § 1983 complaint (Doc. 1-1) and motion (Doc. 1) to proceed in forma pauperis.  The complaint

---

[1] Nathem was the Health Services Administrator for NaphCare at the Black Hawk County Jail from August 2, 2022, to January 3, 2023.

[2] Lein is a Sergeant with the Black Hawk County Sheriff's Office.

[3] Neff is the Administrator of the Black Hawk County Jail.

[4] Thompson is the Sheriff of Black Hawk County.

alleges deliberate indifference based on failure to provide epidural injections for his back pain and other claims related to being handcuffed while using a walker and retaliation or racial discrimination.

On February 24, 2023, I granted Sallis' motion to proceed in forma pauperis and allowed his deliberate indifference claim to proceed based on the failure to provide injections but dismissed all other claims. Doc. 2. Sallis later filed a motion (Doc. 25) to appoint counsel, which was granted. *See* Doc. 33. Defendants have filed answers (Docs. 23, 30) and now seek the entry of summary judgment.

## III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475

U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

3

## IV.    RELEVANT FACTS

The following facts are undisputed unless otherwise noted.

### A.    History of Sallis' Back Pain and Treatment

In 2012, Sallis was diagnosed with congenital lumbar stenosis with multilevel disc bulging and neural foraminal stenosis, which caused severe weakness in his bilateral lower extremities.  Docs. 57-1 at 2; 71-3 at 2.  His medical records show he has suffered from low back pain for years, including occasional pain that radiates down both lower extremities with some tingling.  Docs. 55-2 at 2; 71-2 at 2.  On November 18, 2019, Sallis experienced worsening chronic lumbar pain and was treated with a cortisone injection, which was "minimally helpful."  *Id*.  His provider, Dr. Eric Pitts, also noted that Sallis' back pain was treated with gabapentin, Flexeril, tramadol and ibuprofen.  *Id*.  Prior to incarceration, Sallis had also been treated with epidural and facet joint injections for his back pain.  *Id*.  Specifically, he received lumbar epidural steroid injections on May 14 and June 29, 2020, and on January 28 and May 20, 2021.  Docs. 55-2 at 2-3; 71-2 at 2.  He also received a facet joint injection bilateral at L4-L5 and L5-S1 on August 10, 2020.  *Id*.  These injections were completed at irregular intervals.  After his January 28, 2021, injection, Sallis reported it "did not help much."[5]  In March 2021, Sallis was seen by Dr. Mahesh Mohan.  Mohan noted: (1) the lumbar facet joint injection of August 10, 2020, resulted in a 50% improvement for 2 months; (2) the lumbar interlaminar epidural steroid injection at L5-S1 of June 29, 2020, resulted in a 60% improvement; and (3) lumbar interlaminar epidurals at L5-S1 in May 2019, helped by 60% for more than 6 months.  Docs. 71-4 at 1; 73 at 2.

---

[5] Sallis notes this comment was limited to the January 2021 epidural injection and in October 2022, Dr. Marietta Walsh wrote: "He had injections in the past which have helped some.  He states that the lumbar epidural steroid injection helped the most."  Doc. 71-2 at 2.

4

**B.** *Treatment at Black Hawk County Jail*

Sallis was booked into the Black Hawk County Jail on October 19, 2021. Docs. 55-2 at 1; 71-2 at 1. At the time he filed his complaint on January 5, 2023, he was a pretrial detainee. He was convicted by a Black Hawk County jury on January 26, 2024, and released from Black Hawk County Jail on June 14, 2024. *Id.* Black Hawk County uses a third-party medical provider, NaphCare, to provide medical services to incarcerated persons at the Black Hawk County Jail. Nathem was employed by NaphCare as the Health Services Administrator at Black Hawk County Jail from August 2, 2022, to January 3, 2023. Docs. 55-2 at 2; 71-2 at 1.

At the time of his booking into the Black Hawk County Jail on October 19, 2021, Sallis reported to NaphCare staff that he had asthma, heart trouble, high blood pressure, diabetes, epilepsy/seizure, "congenital heath [sic] disease," "heart spasms," "sleep apnia [sic]" and was "being seen by pain specialist for back pain." Docs. 55-2 at 3; 71-2 at 2. His booking medical history report noted that he had "Back Pain, Injections to Relieve Pain." Docs. 71-4 at 1; 73 at 1. While incarcerated at Black Hawk County Jail, Sallis' chronic back pain was treated by onsite NaphCare providers as well as offsite referrals. Docs. 55-2 at 4; 71-2 at 3. He received epidural injections, facet injections, pain medication, muscle relaxers, muscle rub cream and a walker. *Id.* NaphCare's onsite nurse practitioner and physician saw Sallis 21 times for chronic back pain and arranged eight offsite medical appointments. *Id.* NaphCare also arranged three MRIs and an EMG related to Sallis' back condition during his incarceration. *Id.* Sallis received extra pillows and a mattress to help alleviate his back pain. Docs. 55-2 at 5; 72-1 at 3-4.

On November 8, 2021, Dr. Nicholas Goetsch of NaphCare examined Sallis, noting the reason for the exam as "Intervertebral disc disorders with radiculopathy, lumbar

5

region ASAP, chronic back pain now due for another set of injections."[6]  Docs. 71-4 at 2; 73 at 1.  He requested that Sallis be seen by Dr. Justin Elwood at the MercyOne Pain Management Clinic for injections.  *Id.*  On December 20, 2021, Aimee Grant-Furman, an RN with NaphCare, noted that NaphCare would "call for authorization for outpatient injections."  Docs. 71-4 at 2; 73 at 2.  On January 11, 2022, Sallis sent a medical kite asking if the injection had been scheduled yet and was told they were waiting to hear back from the insurance company.[7]  *Id.*  He sent another kite on January 21, 2022, saying his pain was "at an excruciating level" and asking if his "shots" had been checked on.[8]  *Id.*  Medical staff asked him what shots he was referencing.  Sallis responded:

> I went to pain management at covenant and the doctor said we needed to get injections again.  He wanted to do them early January but there was a question of who will pay.  Last I knew they were trying to get approval from my insurance, but I am in so much pain and it is getting worse, and I am beginning to have shooting pain down both extrimities [sic] which will end up causing them to have to do an epidural injection as well as the pain ingection [sic] into the joints.  The longer I wait the more intense the treatment.  My back is cramping and locking up as well.

Docs. 71-4 at 2-3; 73 at 2.  Staff responded they would look into it.[9]  Sallis sent two more kites on February 7 and 8, 2022, describing extreme pain, and was told both times that they were still looking into it.  *Id.*

---

[6] The NaphCare defendants note Goetsch did not opine that the injections were the only reasonable treatment or that they were medically necessary.  Doc. 74-1 at 2.

[7] Sallis had private health insurance until about July 15, 2022.  Docs. 55-2 at 3; 71-2 at 2.

[8] The NaphCare defendants note subjective claims of pain that are not supported by objective medical evidence, and when Sallis was being treated by means other than injections, cannot create a genuine issue of material fact.  *See Hancock v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022).  As such, they argue that evidence of Sallis' medical kites and grievances does not impact their motion for summary judgment.  *See* Doc. 74-1.

[9] For nearly all of Sallis' statements of additional facts, the Black Hawk County defendants acknowledge that Sallis sent certain medical kites or submitted grievances but deny the truth of

On February 11, 2022, Goetsch signed an Offsite Healthcare Authorization for Sallis to see Elwood for pain injections. *Id.* Sallis sent another medical kite on February 16, 2022, asking if there had been progress setting up the injections and staff responded they had communicated with the office. Docs. 71-4 at 4; 73 at 3. On March 11, 2022, Sallis asked again if there had been progress scheduling his injections and staff told him his appointments had been scheduled. *Id.* On March 18, 2022, he sent a follow up asking if they were scheduled soon and medical staff confirmed they were. Docs. 71-4 at 4; 73 at 4. On March 23, 2022, Sallis sent a kite inquiring again about his injections stating his pain was "getting much worse than it was." Medical staff responded that an appointment had been scheduled but they could not give him the date and time. *Id.* On March 25, 2022, Sallis received bilateral facet injections at L4-L5 and L5-S1. Docs. 55-2 at 5; 71-2 at 4.

On July 21, 2022, Sallis sent a medical kite asking if an appointment had been scheduled for an epidural injection. He stated he was in constant pain and numbness in his lower extremities for the past few months and it was getting worse. Staff responded he did not currently have a scheduled appointment and that he would need to prepay for his visit per the pain clinic. Docs. 71-4 at 4-5; 73 at 4. *See also* Docs. 55-2 at 4; 71-2 at 3. A staff note stated:

> Leslie with MercyOne Pain Management called to ask if the inmate had any current insurance. When he was in their office on 7/8/22 he stated that NaphCare was responsible for all of his bills. I let her know that is not the case. This was a pre-existing condition and therefore it is his responsibility. She stated that his private insurance that is provided through is [sic] wife is no longer active and because he is now a self pay they will not schedule an appointment for his injection until he is able to pay in full. I have let the doctor know this also.

Doc. 71-2 at 2-3. Sallis submitted a medical grievance on July 21, 2022, stating:

---

his statements, explaining that his statements to medical providers were self-serving and inconsistent with other statements and observed behaviors and that the information has no relevance to defendants' motion for summary judgment. *See* Doc. 73.

> I was denied medical care today because I am unable to 'Pay' for my
> medical care . . . . My pain doctor already stated that I needed an epidural
> injection. I am currently in custody of the jail and my medical expenses
> should be covered by the jail insurance . . . I should not be made to sit in
> pain because I cant [sic] pay for an injection.

Docs. 71-4 at 5; 73 at 4. On July 27, 2022, Sallis sent another medical kite stating he
continued to have extreme pain in his back, numbness in his legs and pain that shot into
his legs constantly. He asked if he was going to be denied care for these issues. Medical
staff responded that he was on the provider list to be reviewed on next rounds. Docs.
71-4 at 5; 73 at 5. On September 6, 2022, Sallis sent a medical kite stating:

> I've been here a year next month and have struggled with the medical staff
> providing me with needed care for pain management for my back. The Dr.
> and nurse practitioner have both made recommendations that have not been
> followed . . . . I have tried to NOT bug yall in hopes something can get
> done. Nothing has happened. Is there a plan in place for the management
> of my pain??? Or is it a matter of me not getting care because I can't pay
> for my injections?!

Docs. 71-4 at 5-6; 73 at 5. Medical staff responded: "You have spoken with the provider
regarding your 'pain management.' No need to further kyte regarding this."[10] *Id.*

Sallis submitted a medical grievance that same day over the denial of ordered
treatments. Neff responded on September 12, 2022: "Because the back pain is pre-
existing, you are responsible for paying for the injections if you wish to receive them."[11]
*Id.* Sallis also submitted a medical grievance over the instruction not to submit further

---

[10] The NaphCare defendants note there is no evidence that Nathem was involved in this
communication. Doc. 74-1 at 10.

[11] The NaphCare defendants note these communications were not with them and that they
continued to monitor Sallis and provide treatment and care for his back condition. Doc. 74-1 at
11. They note that Neff additionally explained: "You are receiving pain meds, and you have an
MRI scheduled. You are not being denied medical care for anything . . .. Just because it isn't
your preferred method of treatment does not mean you aren't being treated for it." *Id.*

kites about his back pain.[12]  Nathem responded that because his back pain was preexisting, it was his responsibility to cover the cost.  Docs. 71-4 at 7; 73 at 5.  On December 9, 2022, Sallis sent a medical kite stating he had been through every test for his back and they were all significantly remarkable.  He claimed four doctors, including a jail provider, recommended injections and an EMG showed his impingement was worsening.  He asked what else needed to be done for him to receive his injections.  *Id*.  Medical staff responded: "All kytes must contain your headshot/face or they will be denied."[13] *Id*.  Sallis submitted another medical grievance on December 19, 2022, complaining about not receiving his back injections due to an inability to pay and discussing his worsening back condition.  *Id*.  Nathem responded that any treatment cost was his responsibility because it was a preexisting condition.[14]  *Id*.

On October 11 and December 19, 2022, neurosurgeon Dr. Marietta Walsh stated she did not recommend neurological intervention based on the imaging study results.  *Id*.  Sallis notes that Walsh also stated "he would benefit from conservative management in

---

[12] The NaphCare defendants note Sallis was not told to stop submitting kites about his back pain, but that Sallis had already spoken with a physician, had several kites on the issue and there was "[n]o need to further kyte regarding this."  Doc. 74-1 at 11.  They add that Nathem explained: "medical has been following the prescribed care.  However, you have been requesting care that has either not been ordered or has been completed due to protocols and time frames."  She pointed out that NaphCare was ordering an MRI to monitor his back and that Sallis was "provided health assessments and care as needed and appropriate."  *Id*. at 11-12.

[13] The NaphCare defendants deny that Sallis' medical records support his claims and note defendants' experts have opined that Sallis' condition was not aggravated by any delay in injections.  Doc. 74-1 at 12.  They also note there is no evidence Nathem was involved in this communication.  *Id*.

[14] The NaphCare defendants deny that Sallis' condition was worsening and note defendants' experts have opined that Sallis' condition was not aggravated by any delay in injections.  Doc. 74-1 at 12-13.  They also note Nathem told Sallis he had an upcoming appointment to be seen by a specialist.  She added: "You also have the responsibility to care for your own health.  Knowing you have back issues, you need to monitor your activities that can cause pain and potentially worsen the condition.  An example of potentially harmful activities is playing basketball, running, twisting and jumping as you were doing a few days ago."  *Id*. at 13.

the form of injections." Doc. 71-2 at 4. Several of Sallis' medical providers suggested treatment of epidural and/or facet joint injections during incarceration. The NaphCare defendants note that none of the medical providers have suggested this was the only possible or effective treatment for Sallis' complaints. Doc. 55-2 at 5. Sallis notes that his healthcare providers have suggested injections as part of the overall treatment plan for his back pain. Doc. 71-2 at 4.

On January 11, 2023, Sallis sent a medical kite asking if he had been or would be scheduled for injections and was told he was still waiting for an appointment.[15] Docs. 71-4 at 8, 73 at 6. On January 23, 2023, Sallis sent a medical kite asking if he had been scheduled for an injection. Medical staff responded that he was still waiting for the appointment. *Id.* On February 19, 2023, he sent a medical kite that his back was "going crazy with pain." *Id.* On April 10, 2023, Sallis submitted a grievance regarding the lack of injections and NaphCare's refusal to authorize payment. Medical staff reiterated its position that because his back pain was a preexisting condition, Sallis would have to pay for any injections.[16] Docs. 71-4 at 8; 73 at 7.

Sallis next received a lumber epidural steroid injection on May 25, 2023, which was provided through a MercyOne financial assistance program. Docs. 55-2 at 5-6; 71-2 at 4. The parties dispute whether this injection was helpful. The defendants cite a medical records review from their designated expert, Dr. Trevor Schmitz,[17] an Iowa licensed and board-certified orthopedic spine surgeon, stating that Sallis reported that the May 25, 2023, injection did not help him and that had Sallis received injections six

---

[15] The NaphCare defendants note this communication occurred after Nathem's employment ended on January 3, 2023. Doc. 74-1 at 13.

[16] The NaphCare defendants note that Neff also explained "neither Naphcare nor the Black Hawk County Jail is refusing you medical treatment. The medical staff is treating your back pain at no cost to you." Doc. 74-1 at 14.

[17] Schmitz was designated as an expert by the NaphCare defendants.

months earlier it would not have helped his condition at that time. *See* Doc. 56 at 8. Sallis notes the only medical record cited in support states: "My back pain has increasingly gotten worse since my shots." Doc. 56-1 at 148. Sallis noted these symptoms started June 1, 2023. Docs. 55-2 at 10; 71-2 at 7. He saw Elwood on June 30, 2023, and reported continued pain the low lumbar region. *Id.* Sallis received two more injections through the financial assistance program – bilateral facet joint injections at L4-L5 and L5-S1 on August 10, 2023, and a lumbar epidural steroid injection on October 31, 2023. Docs. 55-2 at 5; 71-2 at 4.

### C.    *Defendant Nathem*

Nathem was a Health Services Administrator during her employment at NaphCare beginning in August 2022. She was also a registered nurse licensed in the state of Iowa. *Id.* As Health Services Administrator, her duties were mostly administrative, but she also answered medical kites and grievances from inmates and occasionally assisted with med pass. Docs. 55-2 at 6; 71-2 at 5. Nathem was familiar with Sallis because of his frequent appointments and the number of medications he was taking for his multiple health conditions. Docs. 55-2 at 7; 71-2 at 5. Nathem was generally aware that Sallis wanted injections for his chronic back pain and understood he had to pre-pay for them. Nathem would occasionally prepare and administer Sallis' medications for his chronic back pain (among other conditions) including Tramadol, Gabapentin, Tizanidine, and acetaminophen. *Id.* Nathem knew Sallis visited on- and off-site medical providers for his back pain, that he received medication for such pain and was provided a walker[18] and extra mattresses and pillows. *Id.*

---

[18] The parties dispute the extent to which Sallis used the walker. Nathem observed that Sallis used it sparingly, which Sallis denies. Docs. 55-2 at 8; 71-2 at 5. In any event, they agree that when Sallis came into the clinic he walked normally without grimacing or showing other signs of pain. *Id.*

The extent to which Nathem believed Sallis' back pain is greatly disputed. She did not believe Sallis' claimed pain level matched his conduct or that he was in any acute pain beyond what is common for a chronic back pain condition. She also did not believe Sallis' health was at risk by asking him to pre-pay for injections.[19] Sallis denies that Nathem observed him regularly playing basketball with other inmates, running around, jumping and engaging in other athletic activities. *Id.*

Nathem responded to two medical grievances from Sallis. *Id.* The first was dated September 6, 2022, in which Sallis complained about his worsening pain and the response that there was no need to further kite about scheduling his injections. Docs. 55-2 at 8-9; 71-2 at 6. Nathem responded:

> Anyone can and should initiate a kyte for a medical purpose. It is the mechanism used here to obtain care and follow-up. I will discuss with staff your concern. I will also add then when we see you not following the prescribed care, it creates the impression that the health issue has improved or been correct. Medical has been following the prescribed care. However, you have been requesting care that has either not been ordered or has been completed due to protocols and time frames.

*Id.* Sallis asked why he had not received an injection for his back, referencing the fact that he was provided an MRI. *Id.* Nathem stated:

> [NaphCare] provides many types of care. However, for pre-existing conditions, Naphcare does not cover. We do have a provider that can monitor and address certain areas such as the walker, activity, pain medication, and the length of time for medications. Again, however, your back issue was preexisting prior to your being here and is your responsibility to cover the cost. The issue of the MRI is so that the area on your back can be monitored.

*Id.* In a subsequent message, Nathem stated: "You are provided health assessments and care as needed and appropriate." *Id.*

---

[19] Sallis notes Nathem's subjective beliefs are irrelevant. Doc. 71-2 at 5.

12

The second medical grievance from Sallis was dated September 28, 2022, in which he complained that his medical request had gone unanswered for a week and that NaphCare was not taking his medical needs seriously. Docs. 55-2 at 9; 71-2 at 6. Nathem responded: "We are not denying care. You saw Dr. Goetsch on the 20th and no kytes have come through since. If you have a medical issue, submit a kyte and you will be placed on the provider list to be seen." *Id.* After additional back and forth, Nathem explained that providers have to prioritize based on need, Sallis was seen by providers frequently and that they were "not ignoring your health . . . ." *Id.*

### D.    *Defendants' Expert Evidence*

Sallis disputes the opinions of defendants' medical experts that his condition was not aggravated by delay in receiving injections. Schmitz states there is no medical literature basis to support that Sallis' low back condition was aggravated or made worse by any delayed facet and/or epidural injection. Docs. 55-2 at 11; 71-2 at 7. Sallis notes Schmitz's opinion does not reference any medical literature that he reviewed, including any that would support that conclusion. *Id.* While Schmitz opined "[t]here is no evidence of acute worsening between June of 2022, and [Sallis'] MRI in October 2023, nor has his low back condition changed" and that "his low back condition has not drastically changed throughout the years," Sallis notes Schmitz's opinion ignores the myriad of complaints by Sallis about his continuing and worsening back pain. *Id.*

Defendants' other expert, Dr. Harel Deutsch,[20] an Illinois licensed and board-certified neurosurgeon, concluded that Sallis "has no injuries or a worsening of his condition documented due to medical treatment or lack of medical treatment during his incarceration." *Id.* Sallis again argues this ignores the myriad of complaints about his continuing and worsening back pain. Docs. 55-2 at 11; 71-2 at 8.

---

[20] Deutsch was designated as an expert by the Black Hawk County defendants.

13

The parties also dispute the nature and extent of Sallis' symptoms. Schmitz opined that based on his review of Sallis' medical records and imaging studies, there is "a significant subjective, and likely, nonanatomic component to Mr. Sallis' condition, and certainly, the objective findings on MRI do not fully support all of the complaints he had throughout the records." *Id.* Sallis states that Schmitz offers no explanation or rationale for this opinion. Deutsch notes that Sallis "had a history of over-utilizing medical services and subjective complaints with no objective findings." Docs. 55-2 at 12; 71-2 at 8. Sallis notes Deutsch fails to support this conclusion with any specific instances. *Id.* Defendants note that Walsh and Martin also separately noted potential malingering by Sallis because his complaints did not match the objective examination while treating him. *Id.* While Sallis acknowledges these notes, he states any alleged malingering was potential and isolated and there are no pervasive indications of malingering. Schmitz and Deutsch observed that Sallis' expressed symptoms did not match the imaging studies. *Id.* Sallis notes this is based on the notes from Walsh and Martin. *Id.*

Both experts also opined that NaphCare provided appropriate care to Sallis given his condition. *Id.* Deutsch specifically concluded that "[n]o facet joint injections or epidural injections are medical[ly] reasonable or necessary, and therefore not receiving lumbar injections or allegedly receiving them delayed is not a mechanism of aggravation for his back pain condition. *Id.* Sallis disputes this, noting that his treating provider, Goetsch, an employee of NaphCare, prescribed the injections as medically reasonable and necessary.[21] *Id.*

### E. Relevant Policies

Sallis alleges that NaphCare has a "policy" to refuse medical care to inmates who cannot pay for their care for pre-existing conditions. Docs. 55-2 at 13; 71-2 at 9.

---

[21] Sallis' citations in support are to "Offsite Healthcare Authorizations" from Goetsch. *See* Doc. 72 at 6, 14.

NaphCare's A-01 Access to Care Policy states the purpose of the policy is "[t]o ensure that all patients have access to health care for serious medical, dental, and mental health needs in a timely fashion . . . ." *Id.* Sallis notes the policy contains no provision stating that inmates are required to pay for medical care relating to pre-existing conditions and that NaphCare's policy makes no distinction between pre-existing conditions and conditions which first manifest during incarceration. *Id.* The policy provides that "indigent patients will receive clinically appropriate care regardless of ability to pay." *Id.*

Black Hawk County Jail Policy Number 1.2.2. was applicable during a portion of the time that Sallis was confined at the jail and provided that "[i]nmates will not be denied medical services or prescription drugs due to insufficient funds." Docs. 57-1 at 3; 71-3 at 2. The policy of the Black Hawk County Jail is: "The cost of [medical] services will be borne by the inmate, if those services are for treatment of a 'pre-existing' condition, or a condition not related to or aggravated by the jail, except as indicated in Section III, E, above."[22] Docs. 71-4 at 9; 73 at 7. Subsection V(a) provides that the requirement that the inmate pay includes "Treatment or referral for non-urgent, pre-existing illnesses or injuries, as indicated in V, above, including routine care required by a 'chronic care' patient. The cost of this care will be borne by the inmate or other agency responsible for the payment of such care." *Id.*

## V.   DISCUSSION

### A.   *The NaphCare Defendants*

The NaphCare defendants argue they are entitled to summary judgment because there is no evidence to dispute that (1) Sallis' condition was not aggravated by any delay in injections, (2) given the multitude of treatments provided to Sallis for his back

---

[22] The exception in Section III(E) is for "Urgent medical services for an aggravated, pre-existing illness or injury, which was received or being treated prior to arrival at the jail or incarceration."

condition, including his preferred treatment, he cannot show deliberate indifference, (3) two medical expert opinions that Sallis' care was consistent with the standard of care and the injections were not medically necessary; and (4) NaphCare did not promulgate any policy nor countenance any widespread custom that caused a violation of Sallis' constitutional rights.

Sallis clarifies that his claim is limited to the issue of whether the denial and delay of medically-ordered injections for his back pain because of defendants' policy of requiring detainees to personally pay for medical care relating to pre-existing conditions violates the United States Constitution. He argues that the following relevant facts are not in dispute: (1) he had medical problems with his back prior to his incarceration, (2) NaphCare's own doctor ordered epidural injections on November 8, 2021 and February 11, 2022, to be administered by Elwood at the MercyOne Pain Management Clinic, (3) defendants have a policy of requiring detainees to personally pay for medical care relating to pre-existing conditions and (4) defendants refused to provide for and pay for Sallis' back injections when he could not. Sallis acknowledges that it is not a constitutional violation to require inmates to pay for medical care when they can afford to do so, but contends it is a violation to withhold treatment for a serious medical need when the inmate is unable to pay.

Liability under § 1983 may arise "for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker v. McCollan*, 443 U.S. 137, 146 (1979). An inadequate medical care claim is governed by the Eighth Amendment deliberate-indifference standard.[23] *See Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

> Whether an official was deliberately indifferent requires both an objective and a subjective analysis. *Scott v. Benson*, 742 F.3d 335, 339-40 (8th Cir. 2014). Under the objective prong, [the plaintiff] must establish that he suffered from an objectively serious medical need. *See id.* at 340. To be

---

[23] The deliberate indifference standard applies to both inmates and pretrial detainees. *Jackson*, 756 F.3d at 1065; *see also Barton v. Taber*, 908 F.3d 1119, 1123-24 (8th Cir. 2018).

objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the subjective prong, [the plaintiff] must show that an official "actually knew of but deliberately disregarded his serious medical need." *Id.* This showing requires a mental state "akin to criminal recklessness." *Id.* (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Consequently, [the plaintiff] must show "more than negligence, more even than gross negligence" to evince deliberate indifference. [*Fourte v. Faulkner Cty.*, 746 F.3d 384, 387 (8th Cir. 2014)] (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)).

*Id.* at 1065; *accord Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006). To establish an official's deliberate indifference to a serious medical need, a plaintiff must demonstrate: (1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk. *Robinson v. Hager*, 292 F.3d 560, 563-64 (8th Cir. 2002) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)); *see also Morris v. Cradduck*, 954 F.3d 1055, 1058 (8th Cir. 2020). Thus, a plaintiff must demonstrate both an objective and subjective component. *Coleman*, 114 F.3d at 784.

An imperative prerequisite to success on this claim is that the officials "knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). This showing requires a "mental state akin to criminal recklessness: disregarding a known risk to the inmate's health." *Gordon,* 454 F.3d at 862. The result of that requirement is the necessary implication that negligent failure to diagnose and negligent treatment are insufficient to support a claim under the Eighth Amendment. *See Estelle*, 429 U.S. at 105-06; *Bellecourt v. United States*, 994 F.2d 427, 431 (8th Cir. 1993); *see also Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 755 (5th Cir. 2001) ("It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference.").

"It is well settled that an intentional delay in obtaining medical care for a prisoner who needs it may be a violation of the eighth amendment." *Ruark v. Drury,* 21 F.3d 213, 216 (8th Cir. 1994). However, "[t]he Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." *Jenkins v. County of Hennepin,* 557 F.3d 628, 633 (8th Cir.2009). Deliberate indifference may be manifested by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976) (footnotes omitted). "The Eighth Circuit Court of Appeals has been more likely to find delay constituted deliberate indifference for life-threatening ailments." *Celia v. N. Cent. Corr. Facility*, No. C13-3003, 2014 WL 2628676, at *7–8 (N.D. Iowa June 13, 2014), *report and recommendation adopted,* No. C13-3003, 2014 WL 4961450 (N.D. Iowa Oct. 3, 2014). It also considers relevant the length of delay and severity of the condition. *Id.* Moreover, "[w]hen an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'" *Coleman*, 114 F.3d at 784 (quoting *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). "A prisoner alleging a delay in treatment must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Redmond v. Kosinski*, 999 F.3d 1116, 1121 (8th Cir. 2021).

Sallis' challenge is limited to whether requiring an inmate to pay for medically-prescribed injections violates the United States Constitution. As noted above, a "serious medical need" is defined as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Davis v. Buchanan Cnty.*, 11 F.4th 602, 623-24 (8th Cir. 2021). The NaphCare defendants rely heavily on *Hancock v. Arnott*, 39 F.4th 482 (8th Cir. 2022), in which the plaintiff, a pretrial detainee, was diagnosed with a reducible ventral hernia. The jail's physician determined that the hernia did not require immediate

18

surgery and informed plaintiff that if he wanted surgery immediately, he would have to pay for it. *Hancock*, 39 F.4th at 485. The plaintiff filed suit and moved to enjoin the jail from enforcing a policy requiring prepayment for his hernia surgery. *Id.* After the court granted a preliminary injunction, the jail officials subsequently moved for summary judgment and submitted expert evidence that so long as the hernia was reducible, surgery could be delayed. The court granted the motion, concluding that plaintiff had a serious medical need, but that jail officials were not deliberately indifferent to it. *Id.* at 486.

On appeal, the Eighth Circuit disagreed that plaintiff had established a serious medical need. *Id.* at 487. Specifically, it noted that jail officials had delayed the surgery, not denied it, and that plaintiff had failed to submit any medical or expert evidence demonstrating that any delay in surgery created any excessive risk or harm. *Id.* The court rejected plaintiff's arguments that his own claims of pain and suffering were sufficient. *Id.* Because plaintiff did not establish a detrimental effect of the delay in treatment, he had not established a serious medical need requiring immediate surgery. *Id.* The court further reasoned that even if his hernia constituted a serious medical need, the plaintiff had not demonstrated that the jail officials acted with deliberate indifference merely because they did not provide him with the surgery.

Like Sallis, the *Hancock* plaintiff argued that the issue was whether defendants' failure to provide the surgery solely because of his inability to pre-pay constituted deliberate indifference, not whether the care provided to him after it was determined that he had a serious medical need was adequate. *Id.* at 488. The court stated that framing the issue in that way misconstrued the analysis, as an inmate cannot create a question of fact by stating he did not feel he received adequate treatment when there is evidence that the care provided was adequate. *Id.* (citing *Dulany v. Carnahan*, 132 F.3d 1234, 1240 (8th Cir. 1997)). In other words, "[a] prison doctor is not liable merely because he did not implement the inmate's preferred treatment." *Id.* Because the plaintiff had seen jail medical staff more than thirty times and made only intermittent complaints related to his

hernia and objective observations did not indicate that he was in severe pain or forced to limit his activities, jail officials had not disregarded a known risk to the plaintiff's health.

Sallis argues *Hancock* is distinguishable because in Sallis' case, Goetsch prescribed the injections as necessary medical care and NaphCare refused to provide it. In support, he cites the "Offsite Healthcare Authorizations" signed by Goetsch. Doc. 71-1 at 9. The first is dated December 20, 2021, in which Goetsch noted that the reason for being seen was "Intervertebral disc disorders with radiculopathy, lumbar region ASAP, chronic back pain now due for another set of injections" and ordered "Eval and treat for next set of injections by his pain specialist, Dr. Mohan at MercyOne Medical Center." Doc. 72 at 6. The second is dated February 9, 2022, in which Goetsch ordered "pain injections" with Elwood at MercyOne Waterloo Hospital Covenant Medical Center. Doc. 72 at 14.

This evidence does not establish Goetsch ordered the injections as "necessary" medical care. Rather, it establishes that Goetsch placed an order for Sallis to be seen by a specialist who could then order the injections, as Sallis had previously received such injections for his back pain prior to his incarceration. More importantly, Sallis has not met the requirement of placing "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Riebold*, F.3d at 1119-20 ("We have previously held that where an inmate 'submitted evidence documenting his diagnosis and treatment, [but] he offered no evidence establishing that any delay in treatment had a detrimental effect,' the inmate 'failed to raise a genuine issue of fact on an essential element of his claim.'"). Because Sallis has not established a detrimental effect of any delay in treatment, he has not established a serious medical need. *See Hancock*, 39 F.4th at 487.

Even if Sallis could establish a serious medical need, he has not produced evidence that Nathem and NaphCare staff actually knew of and deliberately disregarded that need. Sallis argues that whether defendants appropriately treated his back pain at other times or used other methods is not relevant to whether withholding the medically-prescribed

20

injections due to the jail's policy caused injury to Sallis. I disagree. *See Hancock*, 39 F.4th at 488. The injections were not the only treatment prescribed for Sallis' back pain. Nor is there evidence in the record that the injections were medically necessary. To amount to a constitutional violation, the defendants had to know that requiring Sallis to prepay for the injections created an excessive risk to his health and they failed to act on such knowledge. *See Nix*, 86 F.3d at 765. "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Dulany*, 132 F.3d at 1239. Sallis has failed to raise a genuine issue of material fact that any denial or delay of injections based on prepayment created an excessive risk to his health and defendants intentionally denied or delayed his access to the injections with such knowledge. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." *Id*. at 1240. The record in this case demonstrates that Sallis received treatment for his back pain and defendants have presented expert evidence indicating that the care provided was appropriate. *See* Docs. 55-3 at 17-19, 56 at 6-9, 56-2 at 61-79. Sallis' disagreement, without supporting medical evidence, is insufficient to demonstrate a genuine issue of material fact as to a serious medical need or deliberate indifference. The NaphCare defendants are entitled to summary judgment.

**B.      *Black Hawk County Defendants***

The Black Hawk County defendants argue they are entitled to summary judgment because (1) the Black Hawk County Sheriff's Office is not a suable entity, (2) the individually-named defendants were not involved in Sallis' medical care and are nonetheless entitled to qualified immunity, (3) none of the actors were deliberately indifferent and (4) the official capacity claims fail because there is no underlying

21

constitutional violation and no policy or custom that was the cause or moving force of any constitutional deprivation.[24]

I agree that the Black Hawk County Sheriff's Office is not a suable entity. *See De La Garza v. Kandiyohi Cnty. Jail*, 18 F. App'x 436, 437 (8th Cir. 2001) (affirming dismissal of county jail and sheriff's department because they are not legal entities subject to suit). It is a subdivision of Black Hawk County, which has not been named as a defendant in this action. As such, Sallis' claims against the Black Hawk County Sheriff's Office will be dismissed.

As to the individually-named defendants, Sallis concedes that the claims against Lein should be dismissed entirely and that the claim against Thompson in his individual capacity should be dismissed. *See* Doc. 71-1 at 10, n.5. That leaves an individual capacity claim against Neff and official capacity claims against Thompson and Neff.

With regard to the official capacity claims, "[a] suit against a public official in his official capacity is actually a suit against the entity for which the public official is an agent." *Elder-Keep v. Aksamit*, 460 F.3d 979, 986 (8th Cir. 2006). Municipalities may be found liable in a § 1983 case under limited circumstances, pursuant to the rationale articulated in *Monell v. Department of Social Servs. of New York*, 436 U.S. 658 (1978). *See Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385, 389 (8th Cir. 2007). To impose § 1983 liability on a local government body, a plaintiff must show that an official policy or widespread practice caused a deprivation of a constitutional right. *Monell,* 436 U.S. at 690-91; *see also Clay v. Morgan*, 79 F. App'x 940, 941 (8th Cir. 2003) (affirming summary judgment for defendant because the plaintiff provided no evidence of "any policies or customs concerning the delay or denial of treatment to inmates with diseases like MS"). Regarding *Monell* liability, the Eighth Circuit has stated:

---

[24] While Sallis' failure to present verifying medical evidence that could establish a serious medical need precludes his deliberate indifference claim against the Black Hawk County defendants as well, I will consider their other arguments in the alternative.

Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), (2) an unofficial "custom," id.; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton, Ohio v. Harris*, 489 U.S. 378, 389, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). Policy and custom are not the same thing. "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Alternatively, a plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation." *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).

*Corwin v. City of Independence*, 829 F.3d 695, 699–700 (8th Cir. 2016).

Defendants' assertion that Sallis' official capacity claims fail simply because he has not named Black Hawk County as a defendant is rejected. Defendants cite no authority for that proposition and I am aware of none. Sallis alleges defendants have a policy or custom of not providing prescribed medical care to detainees or inmates for pre-existing conditions unless the detainee or inmate pays for it himself or herself. He cites Jail Policy 1.2.2, which states in relevant part:

V. <u>Billing for Other Services</u>. The Black Hawk County Sheriff will make other medical services available consistent with Iowa Supreme Court decision *Smith v Linn County, 342 N.W.2nd 861 (Iowa 1984)*. The cost of these services will be borne by the inmate, if those services are for treatment of a "pre-existing" condition, or a condition not related to or aggravated by the jail**,** *except as indicated in Section III. E, above*. Costs incurred in these cases will be billed directly to the inmate, or other responsible agency, *or payee*, by the provider.

Doc. 72 at 34 (emphasis in original).[25]  Sallis acknowledges that it is not a violation of the Constitution to require inmates to pay for medical care when they can afford to do so, but argues it is a violation to withhold treatment for a serious medical need when the inmate is unable to pay.  *See* Doc. 71-1 at 12.  To the extent Sallis is making a facial claim, that claim fails as the policy outlined above is consistent with the law.  *See Roberson v. Bradshaw*, 198 F.3d 645, 657 (8th Cir. 1999) (concluding it is not a federal constitutional violation to require inmates to pay for their own medications if they can afford to do so).  An as-applied challenge fails as well because as explained above, Sallis has failed to present verifying medical evidence to establish a detrimental effect in the delay or denial of back injections such that he cannot establish a serious medical need. He also has not come forward with any evidence that the jail had a policy or custom of requiring inmates to pay for necessary medical care.  At most, he has shown that the jail had a policy of requiring inmates to pay for their preferred medical treatment of a pre-existing condition, which is not a constitutional violation.  *See Dulany*, 132 F.3d at 1239 ("[i]nmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment.").  Sallis' official capacity claims against defendants Thompson and Neff fail as a matter of law.

With regard to the individual capacity claim against Neff, the jail administrator, Sallis argues that he is liable because of his involvement in creating and enforcing the policy of requiring detainees and inmates to personally pay for medical treatment related to pre-existing conditions.  Doc. 71-1 at 11.  This claim likewise fails, as Sallis cannot demonstrate a fact issue that the jail's policy resulted in a constitutional violation without verifying medical evidence that the back injections were necessary medical care.  Even

---

[25] Section III(E) provides that inmates will not be charged for "[u]rgent medical services *for an aggravated*, pre-existing illness or injury, *which was received or being treated prior arrival [sic] at the jail or incarceration.  A final determination of urgency will be decided by the jail physician or medical director*."  Doc. 72 at 33 (emphasis in original).

if Sallis could establish a constitutional violation, Neff would be entitled to qualified immunity,[26] as there is no case law clearly establishing that there is a constitutional right to a detainee's preferred form of treatment at the jail's expense under the circumstances presented here. *See Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) ("For a right to be 'clearly established,' the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011))).  The Black Hawk County defendants, including the individually-named defendants in their official and individual capacities are entitled to summary judgment.

## VI.  CONCLUSION

For the reasons set forth herein, defendants' motions (Docs. 55, 57) for summary judgment are **granted**.  Judgment **shall enter** in favor of defendants and against Sallis and the Clerk of Court shall **close this case**.

**IT IS SO ORDERED** this 22nd day of November, 2024.

_____
Leonard T. Strand
United States District Judge

---

[26] Qualified immunity shields a government official from individual liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *accord Davis v. Hall*, 375 F.3d 703, 711-12 (8th Cir. 2004).

25